UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES** | |
| v. | CASE NO: 24-cr-246-JEB |
| **Davon Cunningham** | |
| *Defendant* | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Davon Cunningham, through his attorneys Mark Rollins and Christina Raskin, respectfully submits this sentencing memorandum in support of a sentence below the Probation Office's calculated guideline range of 262 to 327 months. This memorandum outlines mitigating factors under 18 U.S.C. § 3553, and includes compelling character letters submitted on Mr. Cunningham's behalf. The parties agreed that an appropriate sentence would be at the low end of the applicable Guidelines range, which is 121 months, the government agreed not to seek application of the career offender provision of USSG § 4B1.1.

**I.      INTRODUCTION**

On March 17, 2025, Mr. Cunningham pled guilty to Count One of the Superseding Indictment, Conspiracy to Distribute and Possess with Intent to Distribute of Fentanyl, Fentanyl Analogue, and Cocaine Base, in violation of 21 U.S.C §§ 846, 841 (a)(1), (b)(1)(A)(vi), and (b)(1)(C). This carries a mandatory minimum sentence of ten years of imprisonment to life imprisonment and a term of supervised release of not less than five years and up to life. Mr. Cunningham agreed to pay a special assessment of $100 as part of his guilty plea. Mr. Cunningham was arrested on May 23, 2004 and held without bond. Mr. Cunningham has been continuously detained since that date and has no disciplinary records at the D.C. Jail.

1

The government and defense are in agreement that the applicable sentencing guideline is §2D1.1, establishing a base level of 30. Both parties further agree to a two-level enhancement under §2D1.1(b)(1), due to the presence of a dangerous weapon or firearm, although the firearm at issue was inoperable. Given Mr. Cunningham's acceptance of responsibility through his guilty plea, the government agreed that a three-level reduction would be appropriate, pursuant to USSG §§3E1.1(a) and (b), resulting in an estimated total offense level of 29.

The parties also concur that Mr. Cunningham's criminal history score totals eight points, placing him in Criminal History Category IV. This results in an advisory guideline range of 121 to 151 months of imprisonment. Importantly, the government has agreed not to seek application of the career offender provisions of USSG §4B1.1.

The parties concur that a sentence within the estimated Guidelines range would be reasonable when considered in light of the factors outlined in 18 U.S.C. § 3553. Accordingly, the parties agree that a sentence at the low end of the applicable Guidelines range, which is 121 months, is appropriate. While the U.S. Probation Office calculated an advisory guideline range of 262 to 327 months based on the application of the career offender enhancement, the government has elected not to pursue this enhancement.

This case involves atypical factors that the Court may appropriately consider in evaluating whether to impose the parties' recommended sentence of 121 months. In light of the parties' plea agreement, and considering Mr. Cunningham's acceptance of responsibility by taking a plea, his traumatic childhood, demonstrated commitment to rehabilitation, and the substantial support he has received from family and community members-as reflected in the attached character letters-a sentence at the low end of the parties' agreed-upon guideline range of 121 to 151 months is both appropriate and just.

II.    **FACTORS UNDER 18 U.S.C. § 3553**

Pursuant to 18 USC § 3553, the Court shall impose a sentence sufficient, but not greater than necessary, to reflect the nature and circumstances of the offense and the history and characteristics of the defendant; to promote respect for the law and to provide

2

just punishment for the offense; to afford adequate deterrence; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational/vocational training, medical care or other correctional treatment.

Attorneys for Mr. Cunningham respectfully submit the following mitigating factors for the Court's consideration in determining an appropriate sentence pursuant to 18 USC § 3553.

**A. History and Characteristics of the Defendant (18 U.S.C. § 3553(a))**

*Traumatic Childhood*

Mr. Davon Cunningham was the fourth child of nine children born to Ms. Alicia Cunningham (Alicia). Each of the nine children has a different father. Although Alicia informed Davon that Mr. Ervin Brown (Ervin) was his biological father, Mr. Cunningham has recently learned that this is likely not accurate. His biological father has yet to be determined.

Alicia faced significant challenges in caring for her children. At the time, she was reportedly using PCP and cocaine base, even in the presence of Davon. She was involved in drug distribution, and frequently incarcerated for narcotics, theft and fraud related crimes. When Davon was an infant, his maternal grandmother, Ms. Helen Cunningham (Helen), recalls an incident in which she heard rustling outside her apartment door. Upon opening the door, she found baby Davon lying on the ground. Helen immediately confronted her daughter, insisting that she was not in a position to care for the child. Although Alicia initially took Davon back, she soon entrusted him to an elderly neighbor in her building who agreed to look after him.

Approximately a year later, Helen insisted that she and Alicia retrieve Davon immediately. When they arrived, they found the child sitting on the floor of the living room, dirty and with a runny nose. Alicia reclaimed custody of her son, but continued to struggle with his care.

According to accounts from neighbors and family members, it was not uncommon for Davon to be found wandering the neighborhood unsupervised, with local residents

3

stepping in to look after him. Even in adulthood, Mr. Cunningham has been reminded by members of his community-particularly those that used to be the neighborhood boys at the time, that they looked out for him and helped feed him during his early years. He has been told that his favorite meals at the time were hamburgers and chicken wings. If Davon wandered off too far, Helen would receive calls from some of Alicia's friends in the neighborhood that they had taken Davon home. Helen thanked them

Davon was 4 years old when law enforcement arrived at the home in connection with an investigation involving drugs and firearms. Despite his mother's objections, young Davon opened the front door for the law enforcement officers. In response, his mother struck him on the head with such force and in a manner that raised immediate concern among the officers on the scene. Child Protective Services (CPS) was contacted and all three children were removed from the home. The CPS report mentioned dog feces throughout the house and even on the children. It appeared that the children may have eaten some of it.

Davon and his two younger sisters were subsequently placed in foster care with a woman who was the sister of one of Alicia's friends. This caregiver was already fostering two of Alicia's other children at the time. In addition, two more of Alicia's children had been placed with separate foster families. Alicia would later give birth to two more children, both of whom were also placed in foster care. In total, all nine of Alicia's children were raised in the foster care system.

Mr. Cunningham recalls waking up in his foster mother's home and meeting two half-siblings he had not encountered before. The residence was a small, two-bedroom house occupied by six children, including Ms. Melvern Reid's (aka Hazel) biological child.

Helen would visit her grandchildren as frequently as possible. During her visits, she observed that the home was overcrowded, unclean, and disorganized. She also noted with concern that the financial support provided to Hazel for fostering the children did not appear to be used for their basic needs, particularly clothing. As a result, Helen made a point of bringing new clothes and shoes for the children each time she visited.

Mr. Cunningham remembers that Hazel spent the majority of her time in her bedroom, smoking cigarettes and watching television. The home was overcrowded, and due to the limited space, the children slept wherever they found a spot. They were largely left to resolve their own disputes without adult supervision.

Tensions were particularly high between Davon and his half-brother, Ronald. The two boys frequently argued and engaged in physical altercations. These ongoing conflicts culminated in a simple assault charge against Davon on September 22, 2003, following an incident in which Davon spontaneously admitted to the police that he had punched his brother.

The police had been called to the residence by Davon's half-sister, Kristina. Following the incident, Hazel reprimanded Kristina and warned her never to contact law enforcement again. Notably, no further calls were made to the police for the remainder of Davon's time in the home, although he recalls that the interpersonal conflicts among the children persisted.

Between the ages of 4 and 15, Davon resided in Hazel's home where he was subjected to frequent verbal and physical abuse. Hazel would use words when addressing him like: dick, bitch, fuck, shit, and asshole. She would say things like: you're not going to be shit, you piece of shit, you are just like your parents, worthless. The verbal abuse made Davon feel like he didn't have family that loved him or would look out for him and support him. He felt all alone and longed to feel close to someone. During her visits, Helen noticed that Davon always walked around with his head hanging down. She would encourage him to raise his head up. You can do it, baby, she would tenderly tell him.

Hazel regularly grabbed and struck him with objects she had at hand, most often using a belt. The abuse extended to all the children in the household and frequently resulted in visible injuries, including bruises and welts.

Davon experienced significant psychological trauma as a result of the physical abuse he endured. At just 8 years old, he engaged in self-harming behavior by banging his head

against a wall at school and expressed suicidal ideation. Following this incident, he was hospitalized for observation and treatment for a period of three months.

When asked by undersigned counsel to explain his actions, Mr. Cunningham stated that he had gotten into trouble at school and was terrified of returning home due to the physical punishment he anticipated receiving. That same year, Davon was diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD) and Conduct Disorder. These diagnoses helped clarify many of his behavioral challenges, including impulsivity, poor self-regulation, difficulty adhering to rules or instructions, heightened risk-taking tendencies, and low frustration tolerance. Although he was prescribed Concerta and Risperdal to help with his chronic illnesses, he was not provided a medical health expert to help manage his medication and symptoms.

Tragically, the adults responsible for Davon's care-particularly Hazel-were not adequately informed or trained to understand or manage his conditions. As a result, they were unable to provide the support he needed and, in some cases, may have inadvertently exacerbated his symptoms. This lack of informed care likely contributed to a cycle of behavioral episodes followed by further punitive responses, including additional physical abuse in the home.

In addition to the verbal and physical abuse Davon suffered at the hands of Hazel, he suffered sexual abuse by his older half-sister, Kristina, while in foster care. Kristina was two years older than Davon and liked to play "Mommy and Daddy" with him. This would involve getting naked and having her fondle and touch Davon's body in a sexual way and kiss and touch his private parts. She wanted to have sex with him but he did not know how.

At the age of 15, Hazel formally relinquished her custodial rights over Davon. He was then placed in the care of Ervin; the man Alicia identified as Davon's father. Davon never returned to live with Hazel again.

Davon lived with Ervin for approximately six months even though, it turns out, Ervin did not have a stable address. The two stayed at different friends' homes and on the weekends, Ervin's girlfriend would come over and bring her girlfriend who was

approximately in her late 30s or early 40s. The girlfriend would sexually molest Davon every weekend. Davon was a virgin prior to this. When Davon told Ervin about this, Ervin replied, I'm proud of you.

Once the school semester started, Ervin experienced difficulty ensuring that Davon arrived at school on time. The school bus was unable to provide transportation because Ervin lacked a stable home address, which raised concerns with school officials and ultimately prompted an investigation.

In an effort to establish a more stable living situation for Davon, Ervin approached an elderly couple he knew and asked if they would be willing to house Davon. The couple agreed; however, they were only able to offer basic necessities such as food and shelter and were not equipped to provide the level of care Davon required.

As a result, child protective services became involved. In response to concerns raised by the school, Davon was removed from the elderly couple's home, and Davon was subsequently placed in a group home setting to ensure more appropriate supervision and support.

During his time in the group home, Davon was first exposed to the street culture of DC. Although he was not living on the streets himself, many of the older and more experienced residents introduced him to aspects of street life. These peers encouraged Davon to engage in risky behaviors including regular alcohol consumption and marijuana use.

In this environment, Davon learned certain "survival skills" that helped him navigate the social dynamics of the group home and avoid becoming a target for bullying or exploitation. It was also during this period that he formed a close and lasting friendship with another resident named Deandre. The two became inseparable during their time there.

When Davon and Deandre turned 18, their paths diverged. Davon was returned to live with Ervin, while Deandre received transitional support services in D.C. However, after just two weeks, Ervin asked Devon to leave, accusing him of having an inappropriate relationship with his girlfriend which Mr. Cunningham denies.

7

With nowhere else to go, Davon turned to his friend, Deandre, from the youth center, who allowed him to stay on his couch. This arrangement lasted until both young men turned 21, at which point they were required to vacate the independent living residence and make it on their own.

Living with Deandre was a difficult time for Davon. Although he had a roof over his head, thanks to Deandre, he had little else. He learned the ways of the streets and tried his best to fit in and fend for himself. Upon turning 21, Davon had to find a place to stay with different friends or family members, each night. It was not uncommon for him to be without clean clothes and he relied on hand-me-downs for a change of clothing. He had to learn to fight in order to survive in the DC streets. He adapted to street living in order to survive.

Davon did take the initiative to enroll in the GED Preparatory Program at the University of the District of Columbia (UDC). The program involved at least ten months of coursework, with three hours of instruction three times a week. Davon successfully completed the program and passed the GED examination  His achievement reflects his determination and demonstrates what he is capable of accomplishing when he focuses on his goals.

*__Substance Abuse__*

Mr. Cunningham began using substances at the age of 14 as a means of coping with early trauma. His addiction unquestionably played a role in the behavior that led to his offense. When he was placed in the group home, he was introduced to a culture of regular substance use. Surrounded by peers who drank alcohol and used marijuana daily, he was encouraged to participate. Mr. Cunningham came to believe that substance use offered a temporary escape from his emotional pain and provided a sense of calm he desperately sought.

While at the youth home, Mr. Cunningham discovered that he could fund his drug and alcohol use by performing small tasks for staff members in exchange for money. It was during this time that he also came to understand the economic value of drugs, learning that they could be treated as a commodity-bought and sold for profit.

After earning his GED and struggling to find employment, Mr. Cunningham-frustrated by his circumstances-began experimenting with PCP, a drug he knew to be his mother's substance of choice. Over time, he also occasionally experimented with ecstasy.

At age 26, Mr. Cunningham was involved in a serious car accident that resulted in significant back injuries. He was prescribed Percocet to manage the resulting chronic pain, which he continues to experience to this day. During legal visits at the jail, meetings with defense counsel would include breaks to allow Mr. Cunningham to stand and move around the room in order to alleviate his discomfort.

Prior to his arrest in the present case, Mr. Cunningham managed his chronic back pain with Percocet, consumed champagne-his preferred form of alcohol due to its taste-and used marijuana on a daily basis. His daily marijuana and alcohol use are consistent with patterns observed in individuals diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD), a condition from which Mr. Cunningham suffers. It is not uncommon for individuals with ADHD to engage in self-medication with substances such as marijuana and alcohol in an effort to alleviate their symptoms. *See Psychiatric Clinics of North America*, Volume 45, Issue 3 September 2022, Pages 503-514.

Mr. Cunningham's offense stemmed from addiction and socioeconomic hardship, not malice.

### *Rehabilitation Efforts*

Mr. Cunningham has expressed a willingness to participate in an alcohol and drug treatment program. Since being incarcerated, with no access to substances, Mr. Cunningham notices that his memory, focus and mood are much better. He fully realizes now the extent of what he did, while he was under the influence, and is extremely remorseful.

Mr. Cunningham has not had mental health counseling and would be grateful for the opportunity to attend trauma focused counseling to open up and talk about his childhood trauma and abandonment issues. He wants help in addressing his resentment towards his mother for giving him up and never being there for him. As an adult, he remembers that she seemed happiest with him when he would give her money even though she knew it

was off of drug sells. He is aware that she used to use and sell drugs herself. Mr. Cunningham hopes that mental health counseling will teach him to learn how to cope with and do better in romantic relationships.

He would also love to participate in mental health counseling to treat his ADHD and Conduct Disorder and would embrace the opportunity to have a full workup and evaluation for his prior back injury and newly diagnosed diabetes.

Mr. Cunningham shared with counsel that he would be interested in trying anything, while serving time at the Bureau of Prisons, that would help him improve himself. He looks forward to moving forward and living a life without crime and to be a good role model to his family.

### *Family and Community Support*

Mr. Cunningham is deeply grateful to have a strong and supportive network of family and community members who continue to stand by him during this challenging time. Even while in jail, Mr. Cunningham sought to stay in touch with his many family members and friends, to lean on their support through what has been one of the most challenging periods of his life. Mr. Cunningham respectfully submits letters from his loved ones in advance of sentencing and asks this Honorable Court give due consideration to these heartfelt expressions of support in determining a just and appropriate sentence.

The following are brief excerpts from the numerous letters submitted as exhibits to this sentencing memorandum, written by Mr. Cunningham's friends and family members. These letters reflect the character and qualities of the man they have come to know and care for deeply.

- **Derricka Little** (companion) describes Mr. Cunningham as a compassionate and dedicated father actively engaged in his community, with plans for mentorship and self-improvement.
- **Jennifer Robinson** (godmother) highlights his kindness, work ethic, and efforts to support her family despite his own challenges. Told counsel that Mr. Cunningham is a product of a childcare system that failed him.

- - **Helen Cunningham-Simmons** (grandmother) emphasizes his traumatic upbringing, resilience, and potential for reform with proper support.
  - **Alicia Cunningham** (mother) acknowledges her own failures but attests to Mr. Cunningham's desire to provide for his family and his nonviolent nature.
  - **Lauren Moore** (sister) underscores his protective nature, remorse, and commitment to rebuilding his life.
  - **L. Kelly** (friend) further demonstrates Mr. Cunningham's personal growth, dependability, and dedication to his family, noting his conscious efforts to live with integrity and purpose.
  - **D. Andrews** (friend) highlights Mr. Cunningham's accountability, personal growth, and dedication to mentoring at-risk-youth as evidence of his sincere commitment to rehabilitation and positive change.
  - **Tamika Cummings** (former romantic partner) Ms. Cummings gave her statement to the presentence report writer. Ms. Cummings described Mr. Cunningham as a loving father who has faced hardships, expressed a desire to change, and has her support and housing upon release, stating that a lengthy prison sentence would be devastating.

Mr. Cunningham is the father of two children, Devon Dominique Cunningham Jr. (age 11) and Demi Skye Cunningham (age 8), both of whom miss him deeply.



Prior to his arrest, Mr. Cunningham maintained a strong presence in their lives, regularly taking his daughter to school each morning and spending quality time with his son. He maintains positive relationships with both children's mothers, Kimberly Cobbs and Lavlonda Pinkston, who speak highly of his commitment as a father. Ms. Pinkston's mother, Joanne Pinkston, also expressed deep affection for Mr.

Cunningham, stating she regards him as a son. Both children and their mothers have expressed a strong desire for Mr. Cunningham's return, and he has expressed a personal commitment to remain actively involved in his children's lives, motivated by his own experience of growing up without a consistently present parent.

Mr. Cunningham vowed to himself that he would be present for his children because he knows firsthand what it is like not to have parents as active participants in a child's life.

*Employment*

Mr. Cunningham has had a history of sporadic employment. At age 16, he worked at Starbucks, earning $5.50 per hour. At age 22, with the assistance of his godmother, Jennifer Robinson, he secured a position as a cashier at a clothing store in Washington, D.C., where he was employed for about one year, earning $11.00 per hour, until the business closed. In 2022, Mr. Cunningham worked for the City of Rockville as a trash collector through a temporary staffing agency; however, he left the position due to repeated issues with bounced paychecks. In 2024, he was offered a position with the Department of Youth Rehabilitation Services (DYRS), but was arrested the day before his scheduled start date. He recalls that during the interview process, one of the interviewers expressed strong interest in hiring him. Mr. Cunningham has expressed a desire to pursue vocational training, particularly in HVAC or welding, with the goal of obtaining certification and establishing stable employment.

**B. Nature and Circumstances of the Offense (18 U.S.C § 3553(a))**

*Substance Abuse*

Mr. Cunningham has struggled with an alcohol and substance use since his early teenage years, beginning with his time at the Youth Center. It is well established that chronic substance abuse can significantly impair judgement, hinder rational decision-making, and contribute to criminal conduct. This longstanding addiction represents a mitigating factor the Court may consider under 18 U.S.C. § 3553(a). In *United States v. Garcia*, 497 F.3d 964 (9th Cir. 2007), the Ninth Circuit vacated a sentence in part because

12

the District Court erroneously concluded it lacked the authority to consider the defendant's drug addiction and resulting mental impairment as mitigating factors under § 3553(a).  This Court reaffirmed that such considerations are within the Court's discretion when determining a sentence that is fair and just in light of the defendant's history and characteristics.

### *Just Punishment for The Offense*

Drug distribution has a profoundly damaging impact on individuals and communities.  Mr. Cunningham fully acknowledges the seriousness of his actions, accepts responsibility for the harm caused, and expresses genuine remorse,  However, respect for the law is not achieved through the imposition of maximum penalties, but rather through outcomes that are fair, proportionate, and individualized.  When a sentence is perceived as just-not only by the defendant but by the public-it strengthens trust in the justice system.  True justice requires more than punitive severity; it demands moral proportionality, taking into account not only the harm caused but also the defendant's intentions, personal history, and potential for rehabilitation.

A sentence of 121 months, as agreed on by the parties, appropriately reflects the seriousness of the offense while also considering Mr. Cunningham's mitigating circumstances.  Additionally, the Court should take into account that Mr. Cunningham's conduct was non-violent and did not result in any identified victims.

### *Adequate Deterrence and Public Protection*

Mr. Cunningham's time in custody since May, 2024 has already served as a significant deterrent.  He grew up without the support or guidance of parents invested in his well-being, and as a result, he deeply understands the importance of being present and engaged in his own children's lives.  He profoundly misses his children, but even more so, he is pained by the knowledge of how much they miss him.

Now sober and free from the influence of alcohol and substances, Mr. Cunningham reflects on his past with shame and sincere remorse.  He acknowledges the harm caused by his actions and the disappointment he has brought to his children.  His childhood was marked by instability-his mother spent more time incarcerated than free,

13

and he never knew his biological father. Determined to break this cycle, Mr. Cuningham is committed to being a consistent and positive presence in his children's lives.

The mothers of his children recognize the value of his involvement and are willing to co-parent, understanding the crucial role he plays in their upbringing. Mr. Cunningham is deeply motivated by the desire for his children to experience the love and support of both parents-something he never had-and to one day be proud to call him their father.

Mr. Cunningham has experienced significant physical and emotional stress as a result of his incarceration, which has had a serious impact on his health. Since being taken into custody, he has lost 40 pounds. More recently, he was diagnosed with acute diabetes-a condition known to be aggravated by stress and other underlying health issues. The jail infirmary is currently monitoring his blood glucose levels daily, which have shown concerning fluctuations, ranging from highs of 500 to lows of 200. These levels present a potentially life-threatening situation. Mr. Cunningham has been prescribed metformin, but medical staff are still evaluating his tolerance to the medication, its effectiveness, and whether dosage adjustments will be necessary.

In addition to the onset of diabetes, Mr. Cunningham has been dealing with a painful and distressing medical issue involving swelling and bleeding in his testicles. He was prescribed pain medication and antibiotics by the jail infirmary, but his symptoms persist. Medical staff have indicated they will monitor his condition for another week before determining whether referral to an outside specialist for further evaluation and treatment is warranted.

There is no doubt that Mr. Cunningham has taken this case with the utmost seriousness and has gained significant insight from the experience. He expresses deep remorse for his actions and is fully committed to ensuring that he never finds himself in a similar situation again. This experience has served as a powerful deterrent, reinforcing his resolve to make lasting, positive changes in his life.

Moreover, Mr. Cunningham's nonviolent history, strong support network, and plans for rehabilitation demonstrate a diminished risk of recidivism.

***Avoiding Sentence Disparities among Defendants***

It is noteworthy that co-defendant Richardson's Presentence Investigation Report, paragraph 39 states, "Defendants Cunningham, Goodwine, Richardson, Hooper, Wright, Mack, and Williams did not exercise managerial authority over any other participant. They were all knowing and willing participants in this conspiracy whose role as narcotics distributors was instrumental in the commission of the offense. They were average participants whose conduct was not peripheral to the advancement of the offense."

Given Mr. Cunningham's role as an average participant and in the interest of avoiding unwarranted sentencing disparities among similarly situated co-defendants, we respectfully request that the Court consider imposing a sentence at the low end of the advisory sentencing guidelines range, as recommended by the parties to be 121 months.

The government's position that it will not seek application of the career offender enhancement, implicitly recognizes that such a designation would overstate Mr. Cunningham's culpability. Imposing a sentence based on the higher range recommended by the Probation Office would result in an unwarranted disparity when compared to similarly situated defendants.

### *Policy Considerations (§ 3553(a)(5))*

Former Supreme Court Justice Anthony Kennedy expressed sentiments about the negative effects of excessively long prison sentences and the state of the American correctional system during a congressional hearing before the House Appropriations Subcommittee on Financial Services and General Government on March 20, 2013. In that hearing, he stated:

> The corrections system is one of the most overlooked, misunderstood institutions we have in our entire government… In many respects, I think it's not working. And the reason it's not working is that it is not rehabilitating. It is warehousing.

He also remarked, we have no interest in corrections. Nobody looks at it. And yet it costs us billions of dollars… We have sentences that are too long. I see it every day. On a separate occasion he aptly noted during a public discussion with former

Harvard Law School Dean Martha Minow, "long sentences have appalling effects on people's lives."

The Sentencing Commission's 2023 amendments emphasize avoiding excessive penalties for nonviolent offenders with trauma histories, like Mr. Cunningham. A sentence at the low end of the advisory sentencing guidelines range of 121 months would reflect the nature and circumstances of the offense, Mr. Cunningham's history and characteristics, and meet the statutory goals of sentencing under 18 U.S.C § 3553(a).

### III.   CONCLUSION

Mr. Cunningham entered a guilty plea in this case as a step toward taking responsibility for his actions, which he acknowledges were wrong. The conduct underlying this offense was of a highly serious nature. Mr. Cunningham readily acknowledges that. He now appears before the Court with sincere remorse and a demonstrated potential for a productive future.

In light of the foregoing, Mr. Cunningham respectfully requests that the Court exercise leniency in its resolution of this matter and give due consideration to his personal history and characteristics, including his experiences of trauma, abandonment, and abuse and neglect. Mr. Cunningham also respectfully asks the Court to consider the circumstances that contributed to his involvement in the charged conspiracy, including his substance abuse and untreated ADHD and Conduct Disorder. Mr. Cunningham fully accepts responsibility for his actions and is committed to returning home as a profoundly changed and improved individual.

For these reasons, and the reasons stated throughout this memorandum, a sentence of **121 months**, consistent with the parties' agreement satisfies the § 3553(a) factors. This term balances accountability with Mr. Cunningham's potential for rehabilitation.

Respectfully submitted,

ROLLINS AND CHAN

/s/

_____

Mark Rollins
DC Bar Number: 453638
Co-Counsel for Davon Cunningham
419 7TH Street, NW
Suite 405
Washington, DC 20004
Telephone No. 202-455-5610
Direct No: 202-455-5002
mark@rollinsandchan.com


By:
CHRISTINA RASKIN LAW

/s/

_____

Christina Raskin
DC Bar Number: 453547
Co-Counsel for Davon Cunningham
1300 I Street, NW
Suite 400 E
Washington, D.C. 20005
Direct No:  202-445-9479
christina@christinaraskinlaw.com


**Date Filed:** June 21, 2025


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 21, 2025 this motion was electronically filed pursuant to the rules of the Court, via ECF.

/s/

_____

Mark Rollins